WORTHINGTON PUMP & MACHINERY CORPORATION, Appellant, vs. NORTHWESTERN IRON COMPANY, Respondent.

*December 14, 1921—January 10, 1922.*

*Inspection of instruments: Materiality of writings sought to be inspected: Control of adverse party: Showing of materiality.*

1. To entitle a party to an inspection or production of writings under sec. 4183, Stats., they must be in the possession or control of the adverse party; and if it clearly appears that all the correspondence material to the inquiry was produced the objects of the statute are fully met, and an order for inspection and production will not be granted.

2. It is essential to the right of inspection that the production or inspection sought is material to the issues involved and affects the merits of the action, but a general allegation of materiality and necessity is insufficient, as facts must be stated showing how and why the discovery or inspection is material; and an order therefor will be denied where the application appears to be made solely for fishing purposes.

3. In an action for damages for the wrongful cancellation of a contract and refusal to deliver a portion of the goods, where defendant's secretary, under adverse examination pursuant to sec. 4096, Stats., produced a written memorandum and correspondence showing that plaintiff had requested a cancellation, to which defendant expressed its willingness on the payment of certain sums by way of adjustment, but that such

offer was never accepted and no agreement as to adjustment ever arrived at, and that defendant's cancellation was not based on such negotiations, such ineffectual attempts at cancellation were immaterial and need not be considered on plaintiff's petition for inspection or production of correspondence passing between defendant and its agent, with whom all of plaintiff's communications were had.

4. Where it appeared from the adverse examination of defendant and from his testimony at the hearing on the petition for inspection, together with that of defendant's counsel, that neither had possession of any correspondence not already produced with reference to such cancellation, and plaintiff, whose allegations and supporting affidavit of counsel were based on information and belief only, could not specify any particular correspondence, the court did not abuse its discretion, under sec. 4183, Stats., in denying plaintiff's petition for inspection.

5. Nor did the court abuse its discretion in refusing to grant an inspection of letters between defendant and its agent as to an alleged agreement to withhold shipments, where no such letters were in fact shown to exist and the materiality thereof, if any, was not shown.

APPEAL from an order of the circuit court for Milwaukee county: LAWRENCE W. HALSEY, Circuit Judge. *Affirmed.*

This is an appeal by the plaintiff from an order entered on June 4, 1921, denying the petition of the plaintiff for an inspection and permission to take copies of letters, telegrams, memoranda, books, papers, and other records passing between the defendant and Pickands, Brown & Company, its agent.

The complaint, among other things, alleges that on August 5, 1918, the plaintiff and defendant entered into a contract by the terms of which the defendant agreed to sell and the plaintiff agreed to purchase 3,000 tons of pig iron, to be delivered in equal monthly quantities from January to June, 1919, at the price of $33 per ton, but with a provision that the price to be paid by the plaintiff "shall be the price fixed for that time by the proper United States government agency, by agreement or otherwise, as the public or market

price for such material, instead of the price herein named; provided, however, that should the government discontinue regulation of prices, then the last price determined by the government shall be that at which any undelivered tonnage on this contract shall be shipped and paid for." A second contract for the purchase and sale of 4,000 tons of pig iron, to be delivered in equal monthly instalments from July to December, 1919, was also entered into, with terms similar otherwise to those contained in the first contract; that subsequent to the entering into of said contracts and in conformity with an agreement reached between the industrial board of the Department of Commerce and the general steel committee of the Iron and Steel Institute, the defendant reduced the price of the undelivered portion of the iron mentioned in the contracts to $26.75 per ton, which price was to take effect on shipments on and after March 21, 1919, and to continue until the defendant advised the plaintiff to the contrary; that the plaintiff accepted such reduction, and that the plaintiff received no notice from the defendant to the contrary, and the government did not thereafter fix or determine the price of iron, and that the price of the undelivered portion of the iron thereafter continued, by agreement between the parties, to be $26.75 per ton; that on May 23, 1919, there were 1,034 tons undelivered on the first contract and no deliveries had been made on the second contract; that on the 23d day of May, 1919, the defendant agreed to defer shipping the balance of said iron and to make no further shipments thereof without consulting the plaintiff with reference thereto; that on the 8th day of December, 1919, the defendant, in violation of the said contracts and agreement, canceled said contracts and refused to deliver the portion of the iron undelivered, and that by reason of such refusal the plaintiff has sustained damages in a large sum of money.

In its answer the defendant admits entering into the con-

tracts referred to in the complaint. The answer further alleges that after the armistice in 1918 there was a decreased demand for pig iron and a decline in the market, and that the defendant, on or about January 18, 1919, voluntarily reduced the price on all shipments of iron under the contracts to $31 per ton, in so far as the iron was to be used by the plaintiff for work taken by the plaintiff after the armistice, and that on or about March 26, 1919, on all shipments made on and after March 21, 1919, under said contracts the defendant would until further notice charge plaintiff $26.75 per ton, f. o. b. cars at the furnace; that the defendant, however, did not agree to reduce the contract price on any of the tonnage which then remained to be delivered under said contracts to the sum of $26.75 per ton or to any sum below what the contract price then was, except as such tonnage should be actually shipped under said contracts or either of them, and no other or further notice should be given in connection with such future shipments; that there was no other change whatever in any of the terms or conditions of said contracts.

The answer further alleges that on May 16, 1919, and on a number of other dates between said time and the 15th day of August, 1919, the plaintiff requested the defendant to defer shipments of iron until further advised. The defendant expressly denies that it ever agreed to make no further shipments under said contracts without consulting the plaintiff with reference thereto, and alleges that the obligation of the plaintiff to accept deliveries of iron continued in force at all times without change, and that the defendant, after numerous efforts to deliver the balance of the iron, which efforts were frustrated by the plaintiff, on or about the 6th day of December, 1919, notified the plaintiff that it had elected to cancel said contracts as to all tonnage undelivered thereunder; that the basis of the cancellation of said contracts was the repeated and long-continued default of the plaintiff under both of said contracts.

Both counsel concede that the issues presented by the pleadings are the following:

1. Whether the defendant was justified in canceling the contracts as to the tonnage which remained undelivered after May 16, 1919, because of the continued refusal of the plaintiff to authorize it to resume deliveries after they had been temporarily suspended on that date, at plaintiff's request; and

2. As bearing on the measure of damages, whether the contract price as to the tonnage which remained undelivered was reduced to $26.75 per ton.

It is conceded that Pickands, Brown & Company of Chicago, a corporation, was the general agent of the defendant, and that the contracts of the parties were negotiated between the plaintiff and such agent, and all negotiations, correspondence, and communications had with respect to said contracts, or the execution or cancellation thereof, were had between the plaintiff and such agent; and that no negotiations were had or communications passed at any time between the plaintiff and the defendant, and that all acts of said agent performed in the premises were duly authorized by the defendant.   Pickands, Brown & Company hereafter will be referred to as "agent."

After issue joined, the plaintiff took the depositions, under sec. 4096 of the Statutes, of Wilmot Saeger, secretary of the defendant, and of Robert S. Dutton, Seymour Wheeler, and Robert J. Krogman, respectively assistant secretary, vice-president, and employee of the agent.   On such adverse examination all of the correspondence passing between the plaintiff and the agent relative to the matters in issue was produced.   Thereupon the plaintiff filed its petition under and pursuant to the provisions of sec. 4183 of the Statutes, praying for an inspection of the original or copies of all letters, telegrams, memoranda, books, papers, and records passing between the defendant and the agent, or the agent and the defendant, between August 5, 1918, and De-

cember 28, 1919, which in any way related to or were connected with the reduction of the price of the iron under said contracts, or either of them, from $33 per ton to $31 per ton; the cancellation of said contracts, or either of them, on the basis of the plaintiff paying the defendant $7.50 per ton, and also relative to the cancellation on the basis of $6 per ton; also relating to the reduction of the price of iron under said contracts to $26.75 per ton; also relating to the withholding of shipments under said contracts or either of them; relating also to the request of the plaintiff to accept deliveries under said contracts, or either of them, subsequent to the 16th day of May, 1919; and relating to the amount of iron still due the plaintiff under said contracts or either of them, and relating to the reason for the cancellation of said contracts or either of them. The petition also alleged, on information and belief, that these documents were in the possession or under the control of the defendant and that they were necessary to enable the plaintiff to prepare its case for trial.

This petition was also supported by the affidavit of one George B. Hudnall, plaintiff's attorney, which among other things set forth and referred to the material portions of the pleadings of the parties, the correspondence which passed between the plaintiff and the agent, and the material portions of the adverse examinations under sec. 4096 of the Statutes, above referred to. These statements will be referred to in detail only as they may appear necessary in the opinion following.

For the defendant an affidavit was made and filed by Charles F. Fawsett, its attorney, and an affidavit of Wilmot Saeger, secretary of the defendant, and a statement made in open court by said Fawsett at the time of the hearing of the petition for an order for inspection. The material portions of the statement and affidavit of defendant's counsel and of its secretary will also be referred to hereafter in the opinion.

The circuit court thereupon entered an order denying the petition, with costs, and from such order so made plaintiff appeals.

For the appellant there were briefs by *Bottum, Hudnall, Lecher & McNamara* of Milwaukee, and oral argument by *George B. Hudnall.*

For the respondent there was a brief by *Fawsett & Smart,* and oral argument by *Charles E. Monroe,* all of Milwaukee.

DOERFLER, J. The writings and correspondence requested may be grouped as follows: (1) Those pertaining to the attempted cancellation of the contracts in December, 1918, and the early part of 1919; (2) the cancellation of the contracts by the defendant in December, 1919; (3) those relating to the reduction of the price of the undelivered tonnage to $26.75 per ton; and (4) as to the withholding of shipments after May 19, 1919.

To entitle a party to an inspection or production of such writings it is necessary that they should be in the possession or control of the adverse party. 6 Ency. Pl. & Pr. 794, and cases cited in note.

If, therefore, it appears clearly that all of the correspondence material to the inquiry was produced, the objects to be accomplished by the statute are fully met. It is also indispensably essential to this right that the production or inspection sought is material to the issues involved and that it affects the merits of the action. 6 Ency. Pl. & Pr. 795. A general allegation of materiality and necessity is not sufficient, but facts must be stated showing how and why the discovery or inspection is material. 6 Ency. Pl. & Pr. 804, 805. An order for production or inspection will be denied where the application appears to be made solely for fishing purposes. 6 Ency. Pl. & Pr. 792, and cases cited in note 2.

We will first consider the attempted cancellation of the contracts in December, 1918, and the early part of 1919.

Saeger, the secretary of the defendant, while under adverse examination produced what purported to be the written memorandum and the correspondence upon that subject, and it appears conclusively from such data that early in December, 1918, the plaintiff requested a cancellation of the contracts, and that some correspondence was had between the agent and the defendant pursuant to the said request; that the defendant wrote its agent and expressed its willingness to cancel the contracts upon the payment of the sum of $7.50 per ton by way of adjustment. This offer of the defendant was communicated by its agent to plaintiff, but was never accepted or acted upon. It also appears clearly from the adverse examination of Mr. Saeger that no agreement between the parties as to an adjustment was ever arrived at, and he further testified that when the contracts were canceled by the defendant on December 6, 1919, it was not based on the negotiations, started early in the year, which provided for an adjustment of $7.50 per ton upon the undelivered portion of the iron under the contracts. Under the evidence referred to, the ineffectual attempts at cancellation early in the year 1919 can have no bearing or materiality as to the issues involved in the action and need not be further considered here.

We will now take up the letters, etc., above referred to under headings 2 and 3, namely, the cancellation of the contracts by the defendant in December, 1919, and the reduction of the price of the undelivered tonnage to $26.75 per ton.

Saeger, secretary of the defendant, made and filed herein an affidavit which among other things avers the following:

"That at or about the time of the commencement of the above entitled action this defendant caused a thorough and careful search to be made by its agents, Pickands, Brown & Company, for all papers and correspondence in the possession or under the control of its said agents in any way relating to the transactions referred to in said action, and all of

such papers and correspondence to be turned over to it, the defendant, for consideration in connection with the controversy out of which said action arose, and thereafter all of such papers and correspondence, including all papers and correspondence in the possession of the defendant itself, in any way relating to said action or to the transactions referred to in the complaint were turned over by the defendant to Charles F. Fawsett, as its attorney, and ever since have been in the possession of said attorney, subject at all times to the inspection and examination of the defendant;" that since the commencement of the proceeding by the plaintiff to obtain an inspection of correspondence which passed between the defendant and its said agents, in respect to transactions referred to in said action, and since the proceedings for the examination of this affiant by the plaintiff as the secretary of the defendant under sec. 4096 of the Statutes, and in connection therewith this affiant has carefully gone through and examined all of said papers and correspondence and says that all of the letters, telegrams, memoranda, or any communications whatever in writing passing between the defendant and said Pickands, Brown & Company between the 5th day of August, 1918, and the 28th day of December, 1919, in any way relating to or connected with the cancellation of the contracts referred to in the complaint, or either of them, on the basis of the plaintiff paying the defendant $7.50 per ton, and also relative to the cancellation of said contracts, or either of them, on the basis of $6 per ton, or relating to the reduction of the price of iron under said contracts, or either of them, to $26.75 per ton, which this affiant was able to find or has since been able to find, were produced by this affiant upon his examination under sec. 4096 . . . and are as shown in the record of said examination on file in this action. That a thorough search has been made for all such correspondence or papers, and this affiant verily believes that said correspondence and papers so produced upon said examination are all of such papers and correspondence in any way relating to said subjects."

Subsequent to the adverse examination of Saeger, referred to under heading 1, and in reply to a question of the witness by plaintiff's counsel, Mr. Fawsett, defendant's counsel, who concededly was in possession of all of the

correspondence between the defendant and its agent, made this statement: "We don't find any more correspondence on the subject of canceling, passing between the *Northwestern Iron Company* and Pickands, Brown & Company." The examination of Mr. Saeger was thereupon abandoned upon the subject of cancellation.

Seymour Wheeler, the vice-president and treasurer of the agent, testified that he wrote a letter of date of December 8, 1919, to the plaintiff, in which the plaintiff was advised of the cancellation of the contracts as to the tonnage undelivered under them. In the adverse examination he stated that he wrote this letter under the instructions of the defendant, but did not remember when he had received the instructions, or who had given him the same, or whether they were in writing or oral. On the same examination he was also referred to a letter of date of December 27, 1919, signed by himself as treasurer of the agent, and with respect to this letter the witness testified that he wrote the letter under instructions from the defendant, but that he did not know whether the request was in writing or oral, or which officer of the defendant requested the witness to write such a letter.

Mr. Fawsett, defendant's counsel, at the close of the argument in the circuit court, presented this statement in open court, which the court stated it would receive to the same effect as though it were verified:

"The letters, Exhibit A, attached to my affidavit filed in this proceeding, being letters dated December 8, 1919, December 27, 1919, and January 9, 1920, in relation to the reasons for the cancellation of the contract involved in this case, are substantially at least, if not wholly, copies of letters which, after examination of the facts in this case, all correspondence, consultation of my clients, I dictated, submitted to them, and which they in turn forwarded to their agents, Pickands, Brown & Company, to be signed and sent to the *Worthington Pump & Machinery Corporation.*"

The letter in the statement of Mr. Fawsett of date of

January 9, 1920, is a reply by the agent to a letter received from the plaintiff dated January 5, 1920, and in which letter the agent reiterates the statements made in its letter of December 27, 1919.

The witness Saeger, on his adverse examination, was asked to produce all of the correspondence passing between the defendant and the agent relative to the reduction of the price mentioned in the contracts to $26.75, and Mr. Fawsett then made the statement that he could not find any such correspondence in his files, and prior to a recess the commissioner directed the witness to make a search of the correspondence and then to report the results, and witness was then asked this question: "Q. Did you find any of the letters I mentioned about before dinner? A. No, I did not."

Now it must be borne in mind that before the close of the hearing in the court below, the defendant's counsel, who concededly had all the correspondence existing in his possession, made a complete statement as to the writing of the letters pertaining to the final cancellation on the part of the defendant of the contracts, that these letters were written by him, delivered to the defendant, and by it transmitted to the agent, who thereupon either forwarded them or sent copies thereof to the plaintiff.

In connection with the reduction of the price of the iron to $26.75, it will appear from the foregoing that not only did defendant's counsel expressly disavow having in his possession any other correspondence on that subject outside of what had already been produced, but Mr. Saeger, the secretary of the defendant, after an examination of the correspondence subsequent to a recess, stated that he found no other correspondence upon the subject. In this connection there must also be taken into consideration the affidavit of Saeger, above referred to, in which he, in substance, states that all of the correspondence between the defendant and its agent was submitted upon the adverse examination and is a part of the record, and that he had made and caused

to be made a thorough search for such correspondence. Bearing in mind, also, that plaintiff could not specify any particular correspondence passing between the defendant and its agents, and that the allegations of the petitioner and the affidavit of its counsel are and were necessarily based upon information and belief, we are of the opinion that, in view of the discretionary power vested in the court under sec. 4183 of the Statutes, the lower court was not guilty of an abuse of such powers in making the order complained of. *Schlesinger v. Ellinger,* 134 Wis. 397, 401, 114 N. W. 825; *Hoyt v. American Exch. Bank,* 1 Duer, 652.

While it must be conceded that sec. 4183 is a remedial statute and should be construed liberally, and while the statute in part is designed to take the place of the old discovery statute and is treated by the authorities and textwriters under the head of "Discovery," nevertheless it is plain that in its application it is not as broad and extensive as sec. 4096, under and by which a broader and more comprehensive field is contemplated for search and investigation.

As to the withholding of shipments after May 19, 1919, constituting the fourth heading above referred to, the plaintiff examined one Robert J. Krogman, an employee of the agent in its order department, and in the course of the adverse examination the witness' attention was called to a number of letters received by the agent from the plaintiff pertaining to plaintiff's requests to withhold shipments of iron from time to time. The witness testified that he communicated with the defendant on the subject of plaintiff's request to defer shipments, and also testified as to instructions received by the defendant in regard to plaintiff's request, but that he could not recall who gave him the instructions, or who instructed him to communicate with the defendant, or as to whether the instructions received by him were oral or in writing.

Plaintiff's counsel thereupon demanded a submission to

him, for the purposes of the inquiry, of all letters passing between the agent and the defendant upon the subject, to which request defendant's counsel refused to accede, upon the ground that no showing had been made warranting the submission of any such correspondence and because such correspondence was immaterial.

In considering this heading we must also bear in mind the affidavit of Mr. Saeger heretofore referred to. The trouble with the inquiry of plaintiff's counsel on this branch of the subject, in part, is that he did not establish the fact that there was any communication in writing between the defendant and its agent or *vice versa*. It was conceded that the entire transaction involved was between the plaintiff and the agent and that no part of the transaction took place between the plaintiff and the defendant. All of the acts of the agent being concededly authorized, anything that the agent did in the premises was equivalent in all respects and in legal effect to an act of the defendant itself. In other words, in legal contemplation the defendant and its agent were one, and the advice, if any, oral or in writing, given by the principal to its agent, or the communications of the agent to the principal, were to all legal and practical purposes the same as though they constituted an unexpressed mental conclusion of the defendant itself. The materiality of this correspondence, etc., is, to say the least, doubtful. We will, however, not determine this matter upon this basis, in order not to foreclose the plaintiff from making a proper showing upon the trial with respect to the materiality. The record does not disclose that the materiality of this correspondence, etc., was brought home to the commissioner or to the court.

From what has been said, we are of the opinion that the circuit court was justified, in the exercise of its discretionary powers vested in it by the provisions of the statute, in refusing to order the inspection requested.

*By the Court.*—Order affirmed.